## CITY COUNCIL OF AUGUSTA *et al. v.* THOMAS *et al.*

1. The decree enjoining the mayor, clerk of the city council, and the comptroller, is not one the effect of which is to enjoin the City Council of Augusta as such from the exercise of a quasi-legislative act, but only the officers named from entering into the proposed contract to buy or hire the boat or barge mentioned therein; and therefore it is not such premature action as will prevent the court from passing upon the merits of other questions involved in the case.

2. Under the act of January 31, 1798 (Marbury & Crawford's Digest, 136, 138), the City Council of Augusta has "full power and authority to make such assessments on the inhabitants of Augusta, or those who hold taxable property within the same, for the safety, benefit, convenience, and advantage of the said city, as shall appear to them expedient." Accordingly, the City Council of Augusta has authority under its charter to purchase or hire a boat or barge for public municipal purposes, to be used in transportation for the city, or for other purposes, where it is for the advantage of the city.

3. It does not appear from the pleadings and the evidence that to purchase or hire a boat or barge, as referred to in the preceding note, would create a debt in contravention of art. 7, sec. 7, par. 1, of the constitution of the State (Civil Code of 1910, § 6563), which provides that "no such county, municipality, or division shall incur any new debt, except for a temporary loan or loans to supply casual deficiencies of revenue," etc.

No. 4575. DECEMBER 22, 1924.

Injunction.    Before Judge Franklin.    Richmond superior court. October 11, 1924.

Landon Thomas, Bowdre Phinizy, and George B. Stearns, as citizens and taxpayers of the City of Augusta, hereinafter called plaintiffs, brought an equitable petition against the City Council of Augusta, Julian M. Smith as mayor of the City of Augusta, Jesse W. Westmoreland, clerk of the City Council of Augusta, and Theodore D. Caswell, comptroller of the City Council of Augusta, hereinafter called defendants, and alleged in substance the following:    For several months past the City Council of Augusta has had under consideration the advisability of buying or hiring a boat or barge; and unless restrained and enjoined, they will do so and put the boat or barge upon the Savannah River upon which the City of Augusta is located, and operate it or cause it to be operated between Augusta and Savannah, and carry or cause to be carried thereon property of persons other than the City Council of Augusta.    The mayor of Augusta, purporting to act under authority from the city council, appointed a committee, denominated "The Savannah River Development Committee," for the purpose of determining the facts with respect to navigation on the Savannah River, with the duty of reporting its recommendations to the mayor and City Council of Augusta.    On May 19, 1924, the committee made its report and recommended, first, that the City of Augusta appropriate a maximum sum of $135,000 to be expended in the purchase of a modern boat suitable "to our needs;" second, that a commission composed of five or seven men representing distinctive lines of business be created, with authority to lease the boat or secure its operation by private parties under such contract and on such terms as may further the enterprise and be to the best interests of the citizens of Augusta.    On May 25, 1924, upon consideration of the report of that committee, the City Council of Augusta unanimously resolved "that the matter be referred to the finance committee of the City Council of Augusta, to report back."    On August 18, 1924, the finance committee by a majority vote adopted a resolution approving the report of the committee.    Plaintiffs are unable to attach a copy of the resolution adopted by the finance committee, for the reason that, although they requested the clerk of the city council to permit them to inspect the minutes of the meeting of the finance committee, the request was refused on the ground that the

meeting of the committee was in executive session and its action could not be divulged. The finance committee has made, or is about to make, its report to the city council, recommending among other things that the city council appropriate the sum of $135,000, or so much thereof as may be necessary, for the purchase or hiring of said boat or barge. A majority of the members of the city council are in favor of the purchase or hiring of the boat or barge, and will cause the city council to adopt a resolution or pass an ordinance authorizing and directing the mayor, or some other person or persons, to buy or hire the boat or barge, unless enjoined by the court. There is no legal warrant or authority for the City Council of Augusta to buy or hire the boat or barge, or to make any contract or agreement for its purchase or hire, or to appropriate money in payment therefor. If plaintiffs defer the filing of this petition until after the city council has made the appropriation and adopted a resolution or ordinance authorizing the purchase or hiring of the boat or barge, they believe that the purchase or hiring will be consummated before they can file their petition to enjoin the same, and that upon the making of the appropriation and the adoption of such an ordinance the mayor or some other person will buy or hire the boat or barge without affording plaintiffs the opportunity of testing their right to do so. Plaintiffs are remediless at law and their rights can be protected only by a court of equity. The case here made is one of manifest necessity, and the rights of plaintiffs will be prejudicially affected unless a temporary restraining order is granted instanter. Plaintiffs, waiving discovery, pray that the defendants be temporarily restrained and enjoined from buying or hiring the boat or barge, and from entering into any contract or agreement of any kind for its purchase or hire; that the City Council of Augusta be temporarily restrained and perpetually enjoined from appropriating any sum for the purchase or hiring of the boat or barge, and that the controller of the City of Augusta be likewise restrained and enjoined from using the funds of the city council for the purpose of paying for the boat or its hire in whole or in part.

A temporary restraining order and rule nisi were granted by the judge. Plaintiffs amended their petition by alleging that the city council has not in its treasury a sufficient sum that can be lawfully used to pay for the boat or barge or for the hire thereof; and by praying that the defendants be required to answer under oath: (1)

How much money is there now in the treasury of the City Council of Augusta? (2) How much of the money now in the treasury of the city council has been appropriated for objects and purposes other than the buying or hiring of a boat or barge, stating specifically the other objects and purposes and the amount appropriated for each? (3) How much money has the City Council of Augusta the authority and ability to raise by taxation during the current year, in addition to the money now in its treasury? (4) How much of the money which the City Council of Augusta has the authority and ability to raise by taxation during the current year has been appropriated for purposes other than the buying or hiring of a boat or barge? (5) To pay for a boat or barge or for the hire of same, would it not be necessary for the city council either to borrow money for that purpose or to use funds already appropriated for other purposes? (6) State fully and in detail how the city council will provide funds to pay for a boat or barge or for the hire of same, to be used or operated on the Savannah River.    Plaintiffs further alleged that the carrying into effect of the scheme recommended by the finance committee of the city council would be illegal and void, in that the city council has no power or authority to make such appropriation to purchase or enter into a lease directly or indirectly, and to do so would in effect be either donating or lending the city's credit contrary to the provisions of art. 7, sec. 7, par. 1, of the constitution of the State of Georgia; and because, even if the city council had the power to enter into an arrangement as contemplated by the recommendation of the finance committee, it could not delegate to an individual member or commission the exercise of powers of buying a boat or leasing the same as contemplated.    Plaintiffs further prayed that the respondents and each of them be perpetually enjoined from carrying out any resolution or ordinance of the city council which itself may undertake to carry out the recommendation of the finance committee.    A further amendment alleged that there is no legal warrant or authority for the city council to employ a boat or barge even for the transportation of such freight as may be necessary to be transported by and for the use and needs of the City Council of Augusta between the City of Augusta and any other place beyond its limits, nor to lease it to a person or company to operate it in the transportation of freight upon the Savannah River between Augusta and Savannah, either for the city council alone or for the city

council and other parties, either as a private carrier or a common carrier of freight; and they pray to enlarge the prayers of their original petition so as to make them applicable to a boat or barge to be used in any of the ways set out in this amendment. The defendants answered the petition, admitting some of the allegations and denying others, and averred that "none of the defendants has ever had 'under consideration the advisability of buying or hiring a boat or barge' in any illegal manner, if and when lawfully authorized to buy or hire a boat or barge; and they expressly deny that they have ever intended the doing of any illegal act in the execution of any such authority if conferred on them or either of them," etc. After a hearing the court granted a temporary injunction; to which order the defendants excepted.

*Archibald Blackshear*, *William M. Howard*, and *Benjamin E. Pierce*, for plaintiffs in error.

*Cumming & Harper*, contra.

HILL, J. (After stating the foregoing facts.)

The questions presented for consideration under the bill of exceptions in this case may be confined to three: (1) Was the effect of the decree enjoining the mayor, as such, of the municipality of Augusta, and the clerk and comptroller of the city council, to enjoin the City Council of Augusta from acting within the sphere of its legislative powers; and if so, are the questions raised by the present bill of exceptions premature? (2) Was it error for the trial court to hold that the above officials did not have the charter power to purchase or hire a boat or barge for municipal uses? (3) Was it error for the trial court to hold that the City Council of Augusta was not in financial condition to purchase and operate a boat upon the Savannah River, etc., for the reason that there were no unappropriated funds available to make such purchase, and that such purchase was the incurring of a debt within the meaning of art. 7, sec. 7, par. 1, of the constitution of Georgia?

1. It is insisted by learned counsel for plaintiffs in error that the effect of the decree is to enjoin the "municipal legislature" from acting within the sphere of its legislative powers, and is therefore premature. It is insisted that no municipal action had been taken on the resolution introduced into the City Council of Augusta, and that neither the mayor nor the clerk of the city council nor the comptroller could do any act complained of, without express legis-

lative direction from the City Council of Augusta; and therefore to enjoin these officials was in effect to enjoin the City Council of Augusta itself; and quite a number of authorities are cited for the proposition that an injunction will not issue to prevent the passing of an unconstitutional or otherwise void ordinance, where it will not result in an irreparable injury; and further, that the injury threatened must be impending as a direct result of the voting on and passing of the ordinance, as distinguished from injury that may result from carrying out or enforcing the ordinance; that where it is the enforcement of the ordinance that will cause the injury, it is the *enforcement* that must be enjoined.   Plaintiffs in error cite, in support of ·their proposition, the provisions of the constitution of Georgia, as set out in the Civil Code of 1910, § 6379; 22 Cyc. 891; *Mayor* v. *Mitchell,* 74 *Ga.* 377; *Bacon* v. *Walker,* 77 *Ga.* 336; *Rounsaville* v. *Kohlheim,* 68 *Ga.* 668 (45 Am. R. 505) ; *Stonecypher* v. *Putnam Mills,* 151 *Ga.* 12; 14 R. C. L. 437; N. O. Waterworks Co. *v.* City of N. O., 164 U. S. 471 (17 Sup. Ct. 161, 41 L. ed. 518) ; 32 Cyc. 262; Slade *v.* Lexington, 121 S. W. 621; Murphy *v.* East Portland, 42 Fed. 308; Des Moines Gas Co. *v.* Des-Moines, 44 Iowa, 505 (24 Am. R. 756).   These authorities seem .to sustain the proposition laid down above.   But it will be noted that the trial judge did not undertake to restrain the City Council of Augusta, as such, from passing any resolution or ordinance. The order of the judge is:   "That Julian M. Smith in his representative capacity as mayor of the City of Augusta, and Jesse W. Westmoreland in his representative capacity as clerk of the City Council of Augusta, and Theodore D. Caswell in his representative capacity as comptroller of the City Council of Augusta, and any other person or persons purporting to act under the authority of the City Council of Augusta, be perpetually enjoined from buying or hiring said boat or barge, and from entering into any contract or agreement of any kind whatsoever for its purchase or hire; and the restraining order heretofore issued in said cause as to said officers herein named be and the same is hereby continued in full force and effect."   It will be observed that the language of the order is that "the restraining order heretofore issued in said cause *as to said officers herein named* be and the same is hereby continued in full force and effect."   We construe that order not to enjoin the City Council of Augusta as such, but only the officers named, from

entering into the proposed contract to buy or hire the boat or barge; and therefore we are of the opinion that the order excepted to is not one enjoining "the municipal legislature" from discharging such duties as it may have the power to discharge under the charter of the City of Augusta. We think that the present case, and the exceptions to the injunction granted by the trial judge, are not premature as insisted by plaintiffs in error.

2. Did the trial judge err in holding in effect that the officers of the City Council of Augusta named in his order did not have authority or power under its charter to purchase or hire a boat or barge for its own public municipal purposes? In 28 Cyc. 350 (4) it is said: "Municipal ordinances, being established by the exercise of a delegated function of legislation for a limited locality and particular purposes, subordinate to the general government of the State, are obviously subject to many restrictions and limitations, which confine them to a comparatively narrow field. A community, although incorporated and invested with the power of local self-government, is none the less an integral part of the State, and its inhabitants are subject to the same general laws as the rural population, and their ordinances can not regulate civil rights and liabilities. As such inhabitants can not be deprived of their personal or property rights except by due process of law, so neither can they, in the exercise of municipal functions, renounce their allegiance or repudiate their civic obligations. They are incorporated for public purposes only, and may not pervert public powers to private purposes. The common weal of the community is the pole star of its organization, and to it the corporate course must always be directed, and all municipal legislation must subserve that end." Under the last sentence of the quotation from Cyc. is annotated the case of *Frederick* v. *City Council of Augusta,* 5 *Ga.* 561. The complainants in the *Frederick* case sought to enjoin the collection of a tax which the City Council of Augusta by ordinance passed, "to provide for the construction of a canal for manufacturing purposes, and for the better securing of an abundant supply of water for the city." It was sought to enjoin the collection of the tax, upon the ground "that the city council had no authority by law to levy taxes on real estate to be expended without the corporate limits, whereas the canal was constructed from a point called 'Bulls Sluice' some seven or eight miles from said city." In that case this court held: "A

corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly or as incidental to its very existence. These are such as are supposed best calculated to effect the object for which it was created. ·. . Where by the terms of the charter a municipal corporation was vested with 'full power and authority to make such assessments on the inhabitants of the city, or those who hold taxable property therein, for the safety, benefit, convenience, and advantage of the said city, as shall appear to them expedient': *Held,* that an assessment of a tax of one half of one per cent. on the value of the real estate within the corporate limits of the city, by the city council, for the purpose of constructing a canal for the better securing an abundant supply of water for the city, was not a violation of the charter, nor contrary to the laws of the land."

In the opinion it was said: "The counsel for the plaintiffs in error insists in his argument, that the city council have no power or authority, under the charter and the laws of the land, to assess and collect the tax in question. By the 22d section of the first article of the constitution of this State, it is declared, 'The General Assembly shall have power to make all laws and ordinances which they shall deem necessary and proper, for the good of the State, which shall not be repugnant to this constitution.' Prince, 905. The same provision was contained in the constitution of 1789. Marbury & Crawford's Digest, 15. On the 31st January, 1798, the City of Augusta was incorporated. The power intended to be delegated to the corporate authorities of the city by the legislature, and the reasons therefor, may be gathered from the preamble to the act, which recites, 'Whereas, from the extent and population of the Town of Augusta, its growing importance, both with respect to increase of inhabitants and diffusive commerce, it is indispensably necessary that many regulations should be made, for the preservation of peace and good order within the same; and whereas, from the many weighty and important matters that occupy the attention of the legislature at their general meeting, it has hitherto been found inconvenient, and may hereafter become more so, for them to devise, consider, deliberate on, and determine all such laws, and regulations, as emergencies or the *local circumstances* of the said

town may from time to time require, be it enacted, &c.' Marbury & Crawford's Digest, 136. It was manifestly the intention of the legislature to delegate to the corporate authorities of the City of Augusta the power and authority to make such laws and regulations for the inhabitants of the city, as 'contingencies or the local circumstances' thereof might from time to time require. The legislature under the constitution, as we have seen, had the power to make all laws and ordinances which they might deem necessary and proper, for the good of the State, not repugnant to the constitution. What power and authority did the legislature delegate to and confer upon the City Council of Augusta, by the act of 1798? The act declares, that the City Council of Augusta, 'shall be vested with full power and authority, from time to time, under their common seal, to make and establish such by-laws, rules, and ordinances, respecting the harbor, streets, public buildings, workhouses, markets, wharves, public houses, carriages, wagons, carts, drays, pumps, buckets, fire-engines, the care of the poor, the regulation of disorderly people, negroes, and in general any other by-law or regulation that shall appear to them requisite and necessary for the *security, welfare,* and *convenience* of the said city, or for preserving peace, order, and good government within the same; and the said city council shall also be vested with full power and authority to make such *assessments* on the inhabitants of Augusta, or those who hold taxable property within the same, for the *safety, benefit, convenience, and advantage of the said city, as shall appear to them expedient.'* Had the City Council of Augusta the power and authority, under their charter, to make and establish the ordinance for the assessment of the tax in question, on the real estate of the complainants, located within the limits of the city, as stated in the record? We are of opinion, the city council had such power and authority, under their charter of 1798; but if they did not, the act of 27th December, 1845, expressly adopts and confirms the ordinances of the city council in regard to the construction of the canal, which, in our judgment, it was competent for the legislature to have done. Truchelut. *v.* The City Council, 1 Nott & McCord's Rep. 227. But it is contended, the tax assessed by the city council on the property of the complainants is against common right, and the principles of the social compact, and operates *oppressively.* The answer to this argument is, that the City Council of Augusta

had the authority delegated to them by the sovereign power of the State, to make the assessment on the inhabitants of the city. When the lawmaking power acts within the scope of its delegated authority, the courts can not interfere. It is the duty of the judicial tribunals of the country to *execute* and *enforce* all *constitutional* laws, and not to make them. The remedy against the effect of oppressive legislation, delegated to municipal corporations, is in the hands of the people, or their representatives. It was competent for the legislature to have *restricted* the power of legislation by the corporation, in its charter, and the inhabitants of the city elect their own officers, whose ordinances are presumed to express the will of the majority. . .

The power delegated by the General Assembly to the City Council of Augusta, as appears by their charter, is to make assessments on the inhabitants of the city, or those who hold taxable property therein, for certain specific objects, to wit: for the *safety, benefit, convenience, and advantage of the said city, as shall appear to them expedient.* In pursuance of the authority thus delegated to them, the city council have adjudged by their ordinance that it is for the safety, benefit, convenience, and advantage of the City of Augusta that the canal mentioned in the record should be constructed for the purpose of better securing an abundant supply of water for the city, as well as for manufacturing purposes, and have made an assessment upon the real estate, within the limits of the city, of one half of one per cent. on the value thereof, to enable them to accomplish that object. The inhabitants of the city are to be furnished with an abundant supply of water, to protect their property against fire, and for other purposes, and the payment of the tax assessed by the city council on the property of the inhabitants so to be protected is the means by which the contemplated benefits are to be enjoyed by them. We see nothing in the ordinance which is *unreasonable,* or which violates the charter, or the laws of the land."

The language of the charter of the City of Augusta, construed in the *Frederick* case, was the same that is now to be construed. We are unable to distinguish the *Frederick* case from the case at bar. In that case the language of the charter was construed to be sufficiently broad to authorize the City Council of Augusta to construct a canal. Indeed it is hard to conceive of a general welfare clause in a charter being broader than the language of the charter under

review. It confers on the city council the authority to make or establish certain by-laws and ordinances as set out in the charter, "and any other by-law or regulation that shall appear to them requisite and necessary for the security, welfare, and convenience of the said city." Attention is called to the fact that an enabling act was passed in 1845, ratifying the ordinance in the *Frederick* case; but this court did not place its decision upon the enabling act of 1845, for it was said: "Had the City Council of Augusta the power and authority, under their charter, to make and establish the ordinance? We are of opinion, the city council had such power and authority, under their charter of 1798." It is true that the court added, "but if they did not, the act of 27th December, 1845, expressly adopts and confirms the ordinances of the city council in regard to the construction of the canal." In 7 R. C. L. 1005, and authorities cited, one of which is Chicago v. Board of Supervision, 182 Fed. 291, it is said: "An additional reason for a decision brought forward after the case has been disposed of on one ground can not be regarded as dictum." But our attention is called to the fact that the *Frederick* case was before the constitution of 1877, which restricts municipalities as to the extent to which they can go in incurring an indebtedness. We are of the opinion that the decision rendered in the *Frederick* case is not affected by the constitution of 1877, so far as the question now under consideration is involved. We are asked to review and overrule the decision in the *Frederick* case, but upon consideration this request to overrule is denied. Moreover, the constitution of 1877 preserved valid charters of municipalities passed prior to the constitution. Art. 12, sec. 1, par. 4 (Civil Code of 1910, § 6605).

In the case of *City Council of Dawson* v. *Dawson Waterworks Co.*, 106 *Ga.* 696, 709 (32 S. E. 907), it was said by Mr. Justice Cobb: "The authority of the General Assembly to confer upon municipal corporations the power to tax is restricted, but it exists to the extent that a municipal corporation may be authorized to levy taxes for any purpose which is purely public and municipal in its nature." The question therefore arises, was the purpose in the present case for which the tax was to be levied "purely public and municipal in its nature." The answer of the defendants avers that it was. The only witness sworn, to wit, Hon. Julian M. Smith, mayor, testified in part as follows: "Naturally, as executive head of the City

of Augusta, I have been much interested in this action for the operation of a boat on the Savannah River. I am very much; I think it would be the very best thing the city could do to build up the city and to bring the larger digest, and to bring more people here. I do not know of any one thing better that could be done than to put a boat on the Savannah River. I am very much interested in it from the city's standpoint. As to whether or not if a boat was purchased in accordance with this resolution, it will be used as a common carrier of freight, not only for the municipal corporation owning the property but for any other shippers of freight that may desire to patronize it, I would say my first interest representing the city is for the city to have a boat for its own purposes. The City of Augusta in the last two years in its paving program has handled a million tons of freight. As to whether that is' all in my answer, I would say, no sir, I do not think this part of it is in the answer. The paving material has amounted to one million tons in the last two years, and the City of Augusta has various other supplies to haul, and needs a boat for its own personal benefit. It is true that the outside proposition has been discussed, but that has not been in my mind. My principal idea in supporting a boat line is for the city to handle its own freight at a lower price; we can save money; and any development that may come on account of having water transportation would enlarge the city digest, and would lessen the tax on the people living here, and I think it is the only practical thing to do; I am fully convinced of that. It may be to the city's advantage to carry outside freight, but the particular reason the city is for it is for the city's own benefit; that is why I am supporting it. As to whether or not it would follow, as a necessary result of this plan, that such boat would become a common carrier of freight for any one desiring to ship, I would say, it might be to the city's advantage to do that. It is not in contemplation that it be done. Council does not intent to exceed its legal rights, and we are not going to do that. We contemplate securing a boat or barge, in the interest of the City of Augusta itself, for hauling its material."

On the question as to what constitutes public purposes, see Sun Printing Assn. *v.* N. Y., 8 App. Div. 230 (40 N. Y. S. 607) ; *Holton* v. *Camilla,* 134 *Ga.* 560 (68 S. E. 472, 31 L. R. A. (N. S.) 116, 20 Ann. Cas. 199) ; *Saunders* v. *Arlington,* 147 *Ga.* 581 (94 S. E.

1022, Ann. Cas. 1918D, 907) ; Cook v. Portland, 20 Or. 580 (27 Pac. 263, 13 L. R. A. 537) ; Stockton v. Powell, 29 Fla. 1 (10 So. 688, 15 L. R. A. 42). In Rindge Co. v. Los Angeles County, 262 U. S. 700 (43 Sup. Ct. 689, 67 L. ed. 1193), it is said: "Public uses are not limited, in the modern view, to matters of mere business necessity and ordinary convenience, but may extend to matters of public health, recreation, and enjoyment. Thus, the condemnation of lands for public parks is now universally recognized as a taking for public use. Shoemaker v. U. S., 147 U. S. 282, 297, 37 L. ed. 170, 184, 13 Sup. Ct. R. 361. A road need not be for a purpose of business to create a public exigency; air, exercise, and recreation are important to the general health and welfare ; pleasure travel may be accommodated as well as business travel; and highways may be condemned to places of pleasing natural scenery. Higginson v. Nahant, 11 Allen, 530, 576. The Riverside Drive in New York is as essential a highway for public use as Broadway ; the speedway in this city as Pennsylvania Avenue. And manifestly, in these days of general public travel in motor-cars for health and recreation, such a highway as this, extending for more than 20 miles along the shores of the Pacific at the base of a range of mountains, must be regarded as a public use." And see Milheim v. Moffatt Tunnel Imp. Dist., 262 U. S. 710 (43 Sup. Ct. 694, 67 L. ed. 1199, 1201), and cases cited. From the foregoing authorities defining what is a public municipal purpose, and others which might be cited to the same effect, and from the broad language used in the city charter of Augusta, we are of the opinion that the purchasing of a boat for the uses set out in the pleadings as supported by the evidence in this case is a "public municipal purpose" within the meaning of the charter of the City of Augusta. Assuming that the city desired at any time to grade and to gravel its streets with gravel which was beyond the city limits, and they desired to purchase or hire wagons and trucks for the purpose of hauling the gravel into the city and placing it upon the streets, could it be said that that was not a *public municipal purpose;* and if that is so, why could not the city, under the *broad powers* granted by its charter, buy or hire a boat or barge for the purpose of going beyond the city limits for the same or similar purpose, as well as for the other purposes set out in the answer of the city as amended? We are of the opinion that they could do so.

3. Conceding that the City Council of Augusta had the authority and power under its charter, as held in the preceding division of this opinion, to purchase a boat or barge for the purpose indicated in the pleadings, did the trial judge err in granting an injunction against the purchase of such boat or barge, for the reason that to do so would create a debt in contravention of art. 7, sec. 7, par. 1, of the constitution of the State (Civil Code of 1910, § 6563) ? That section provides: "The debt hereinafter incurred by any county, municipal corporation, or political division of this State, except as in this constitution provided for, shall not exceed seven per centum of the assessed value of all the taxable property therein, and no such county, municipality, or division shall incur any new debt, except for a temporary loan or loans to supply casual deficiencies of revenue not to exceed one fifth of one per centum of the assessed value of taxable property therein, without the assent of two thirds of the qualified voters thereof at an election for that purpose, to be held as may be prescribed by law; but any city, the debt of which does not exceed seven per centum of the assessed value of the taxable property at the time of the adoption of this constitution, may be authorized by law to increase, at any time, the amount of said debt three per centum upon such assessed valuation." We are of the opinion, under the pleadings and the evidence in this case, that the facts set out do not amount to the creation of a debt as contemplated in the constitutional provision above quoted, and consequently that the trial judge erred in granting the injunction complained of. There is nothing in the record to show or to indicate that the City Council of Augusta, or any one acting for it, had the intention of creating a debt or borrowing money. The evidence does show that the purchase of a boat or barge was to be limited to the amount that could be realized from the $70,000 of tax executions set out in the answer of the defendant. With reference to this the mayor of Augusta testified substantially as follows:

"I am the present mayor of the City of Augusta and one of the party defendants in this case, and in my answer and that of the codefendants to this petition have undertaken to show from what sources of revenue the city could provide money to make a purchase of the boat as recommended by the finance committee, if the finance committee's action should be adopted by the city council. The

budget was made up at the beginning of the year. A list of all the
city's property was not included in that budget, only the estimated
income from the several different departments, and the rate, based
on the present city digest. The city owns a great deal of property.
They had of course the digest; but in making up the budget,. I
am trying to get at it now, we estimate what the income would be
from certain bills and tax fi. fas. that we had on the books. The
City of Augusta in the early part of the year, in accordance with
its regular practice, and in accordance with its by-laws, had an
assessment made of all taxable property inside the city. After that
was done, the city levied an ad valorem tax upon that property for
the purpose of raising funds for the city's needs during the fiscal
year 1924. The tax rate was made on the digest April last. That
is the only ad valorem tax digest that the city has made this year or
expects to make. In addition to the funds raised from that ad
valorem tax the city has other sources of income. In the early
part of the year the city estimated what it was going to get from
that ad valorem tax, and also estimated what it was going to get
from other sources, undertook to form a budget, and appropriated
that expected revenue to different municipal needs. That appro-
priation is set out in our answer within about $1000 of our esti-
mated revenue. I don't want to lose sight of the fact though,　.  .
that a good portion of that revenue was only estimated; and it is
possible, and it happens very often, that the income from the city
really amounts to more than the amount that we figured we had at
the first of the year. I think that will be true this year. Some-
times it is less, not very often less. Of course, the estimated
amount was appropriated the first of the year; but I say it is hard
to determine; you can not tell what you are going to raise, because
a good deal of the revenue is estimated, and you can not tell until
the wind-up what you really are going to get. Our answer states
that there are certain assets in the possession of the city, which in
my opinion, and in the opinion of those making the answer, that
could be made available to purchase a boat, something like $70,000,
consisting of certain tax executions, a big portion of which is for
ad valorem tax. The proportion of the personalty to the realty is
about one third, so on that basis about two thirds of this tax would
be on real estate. That is the way the digest has been running for
several years. Those executions on the personalty are executions

issued for taxes last year, and some the year prior to that; the further back you go the smaller the amount; because, such executions being on personalty, it is very problematical as to that. I would say that I think if you were to handle it vigorously you could collect from 80 to 90 per cent. of the taxes due on personalty. As to whether or not it has been handled vigorously lately, I would say it has been cleaned up considerably; the amount carried over this year is less than it has been in some ten or fifteen years.

"The executions which grew out of taxes, or based on taxes growing out of realty, are based on taxes for previous years. As to whether in order to realize on those, if the property could be found, they would have to be levied, advertised, and sold, I would say, not necessarily; sometimes when you start a proceeding of that kind it comes in. Occasionally you have to go to the utter limit on it, though in a great majority of instances you do not have to go that far. As what proportion of those tax executions are for special improvements, like street-paving, sewers, or curbing, and things of that kind, I think about ten or fifteen per cent. of it, as well as I remember; but I would like to see the figures, to be exact; the figures will speak for themselves. I have here a memorandum of it; these are the comptroller's figures. The amount of the $74,000, which is for curbing and sidewalk, is $10,767. Yes, it is true that under an ordinance of the City of Augusta the persons against whom those executions are issued, and the property against which they are issued, have several years in which to pay it. I think the first payment is due when the bill is rendered, and then they have four years in which to pay the remainder; five installments to cover a period of four years. Q. Do these executions amounting to some $10,000—the defendants in them would have four years from the date of the execution in which to pay them up? A. Very often, when it gets into this shape, though it is largely because the first payment has not been made. Of course when the first payment is not met within the time, then the whole bill becomes due and payable. As a matter of practice, though, they are permitted, if they come across promptly, to pay it within the four-year period; that is not the law. That is not necessarily the practice; as a matter of practice, if they exercise reasonable promptness that is done in some cases. Very often when it works into that shape you ask the party to pay all of it, and he knows that is

the law; and you get a good deal of it collected, not all of it. None of that $74,000 of tax executions is pledged to secure a loan for the city, nor any of the paving executions, or the special improvement executions, amounting to over $10,000, pledged to secure any debt. There is not included in the estimated income for 1924 in current taxes of $244,565.50, and other taxes of $20,000, any of the estimated taxes embraced in the $74,000; at the present time the $74,000 on the books now is very probably the net amounts outstanding which has not been paid, and the $20,000 estimated income from that amount was very probably from a larger amount than this. The $489,000 is what we raised to pay interest and sinking-fund, and for retiring any bonds that we may have to retire during the year. We have to raise that amount, and of course to make the budget balance have to charge it on both sides. That $489,000 is a part of that total of $888,000 which we estimated would come in in the year. It is not in addition to it; it is part of it. The tax rate is divided into three classes; we have to assess now to take care of the principal and interest and sinking-fund, and that is where this income is from. In other words, that $489,000 is not in addition to the $888,000 which is given as the total estimated income, but it constitutes a part of the $888,000."

In *Gulf Paving Co.* v. *City of Atlanta,* 149 *Ga.* 114, 118 (99 S. E. 374), it was said: "Before a liability for a legitimate current expense can be incurred by a municipality without creating a debt within the meaning of art. 7, sec. 7, par. 1, of the constitution of this State (Civil Code, § 6563), there must, at the time of incurring the liability, be a sufficient sum in the treasury which can be lawfully used to pay the liability incurred, or there must be authority and ability to raise a sufficient sum to discharge the liability by taxation during the current year; or, where the legitimate current expense is for paving a street upon the basis of assessment of abutting property, the money to satisfy the liability must be provided for by the lawful assessment of property by the municipality to pay the cost of paving. *City of Waycross* v. *Tomberlin,* 146 *Ga.* 504 (91 S. E. 560)." And see *Butts County* v. *Jackson Banking Co.,* 129 *Ga.* 801 (60 S. E. 149, 15 L. R. A. (N. S.) 567, 121 Am. St. R. 244). In *Wilson* v. *Gaston,* 141 *Ga.* 770, 772 (82 S. E. 136), it was held: "Where county authorities lawfully engaged in the working of public roads find it necessary to purchase

machinery, such as traction engines, for use in working the roads, it is competent to order such machinery on trial, agreeing to purchase it if it should prove satisfactory, and to return it if unsatisfactory; and where such a contract is made, and the engine after trial is found satisfactory and accepted in January of a given year, to be paid for by a levy of taxes during that year, the contract is not rendered invalid as creating a debt within the contemplation of the constitution, merely because the agreement to purchase the engine on trial was made in December of the preceding year and the trial continued up to the time of the acceptance above mentioned." In the opinion it was said: "Other items were for the purchase-price of a certain traction engine and road scrapes for use on the public roads. The judge was authorized to find that the scrapes were bought in January, 1913, to be paid for by levying taxes for that year. The engine appeared to have been ordered in December, 1912, under a parol agreement that it should be received on trial, and if it proved satisfactory the county would retain it and pay the purchase-price, and if not satisfactory would return it to the vendor. The engine was delivered on trial as above indicated, and on the 6th day of December the clerk of the commissioner, who was unadvised that the engine was received merely on trial, prepared a county warrant for the price thereof, which was issued by the commissioner through a mistake; but upon discovering the error he corrected it, and in January, 1913, having tried the engine and become satisfied that it would perform the services as represented by the seller, he issued another warrant for the price of the same. Under these circumstances the judge was authorized to treat this contract as one made in 1913, at a time when a tax could lawfully be levied during the same year for payment of the purchase-price; and that the transaction did not involve the creation of a debt by the county, within the meaning of the constitution."

In *Lewis* v. *Lofley,* 92 *Ga.* 804 (19 S. E. 57), it was said: "If there are funds in the county treasury sufficient for the purpose [the building of a court-house for the county], the county authorities may contract for its erection, payment to be made when the building is completed, or in installments as the work progresses. Or if taxes are levied, or can legally be levied for the year, sufficient for the purpose, they may contract to pay it out of such taxes

although they are uncollected." And in *Mayor &c. of Hogansville* v. *Planters Bank,* 147 *Ga.* 346 (94 S. E. 310), it was held: "Where the mayor and council of a town procured lights from an electric-light plant, for the purpose of lighting. its streets, at a given price per month, and at the end of the year there was a balance due to the lighting plant for furnishing such lights, and where during the same year taxes were lawfully levied against the citizens of the town for the purpose of paying the light bill, but were not collected and paid into the treasury by the end of the year in which the contract was made and the lights furnished, and the mayor and council gave a demand note for the amount thus due on February 1st of the year following, before the taxes were collected, the giving of such note as evidence of the amount due is not in violation of art. 7, sec. 7, par. 1, of the constitution." See *Monk* v. *City of Moultrie,* 145 *Ga.* 843, 845 (90 S. E. 71). In *Manley Building Co.* v. *Newton,* 114 *Ga.* 245 (5) (40 S. E. 274), it was held: "County authorities may, without being said to create a debt within the meaning of the constitution, contract for the building of a court-house to be paid for out of available funds in the treasury, or with the proceeds of taxes that have been or may lawfully be levied during the year in which the contract is made." On the general question as to what is or is not a debt within the meaning of the constitution of this State, see the able opinion of Mr. Justice Cobb in the case of *City Council of Dawson* v. *Dawson Waterworks Co.,* supra.

Applying the rules laid down in the foregoing decisions, we are of the opinion that the record does not show that the City Council of Augusta, or any one authorized to act for it, created or intended to create a debt within the meaning of the constitution, in order to purchase the boat or barge, as insisted by the defendants in error. We think that the presumption is that those who owe the executions to the amount of $70,000 would pay them, and also that they could be collected; and further that a boat or barge for the purposes indicated would be purchased within the amount that the City Council of Augusta had, or could collect from the executions within the year in which such contract might be made. There is nothing in the record to show that the persons enjoined would purchase a boat or barge for an amount exceeding that which the city council had in hand, or could collect from the executions. It will be

observed that the resolution of the finance committee provided that the city council appropriate the sum of $135,000, "or so much thereof as might be needed" for the purpose; and it can not be assumed that those having the authority would exceed the amount that was in hand or that could be collected from the executions in order to make the purchase. We are therefore of the opinion that the trial judge erred in granting the injunction in this case.

*Judgment reversed. All the Justices concur, except*

BECK, P. J., and GILBERT, J., dissenting. It is well established that powers which a city government may lawfully exercise must be derived from its charter or the general laws of the State. They can exercise no powers except those which are expressly conferred upon them by the State, or such as are necessary to the exercise of their corporate powers, the performance of their corporate duties and the performance of the purposes for which they are created. See 9 Mich. Enc. Dig. 490, for collection of authorities. It is also well established in this State that grants of power to a municipality are to be strictly construed. *City Council of Augusta* v. *Mackey,* 113 *Ga.* 64, 66 (38 S. E. 339). This was a case dealing with the city charter of Augusta. Another case dealing with the charter of Augusta is *Augusta & Summerville R. Co.* v. *City Council of Augusta,* 100 *Ga.* 701 (28 S. E. 126), in which the same rule of construction is applied. Admittedly the claim of the City of Augusta for their right to purchase a steamboat and engage in the business of river transportation depends upon whether the general welfare clause of the city charter affords sufficient basis. The general welfare clause in the charter of the City of Augusta is exceedingly broad, but, in our opinion, it amounts to no more and confers no more authority upon the city than the general welfare clause stated in fewer words generally found in Georgia municipal charters. "While a municipal corporation may lawfully do such things as are necessarily incident to the proper discharge of its public functions, it is not, as a general rule, within the power of such a corporation to engage in an occupation or business such as is usually pursued by private persons." *Keen* v. *Mayor &c. of Waycross,* 101 *Ga.* 588 (29 S. E. 42). In the opinion in that case it was said: "The primary design of the creation of a municipal corporation is, that it may perform certain public functions as a subordinate branch of government; and while it is invested with

full power to do everything necessarily incident to a proper discharge thereof, no right to do more can ever be implied. Accordingly, in the absence of express legislative sanction, such a corporation has no authority to engage in any independent business enterprise or occupation such as is usually pursued by private individuals. In other words, its legitimate duty is to deal with public affairs, and not those which are purely private and entirely unconnected with a proper administration of its governmental duties." That case was a proceeding to enjoin the municipal officers from entering into the plumbing business, on the ground that such business was ultra vires. The court held that there was nothing contained in the charter of the City of Waycross authorizing its officers to engage in such a business, and that "Engaging in such a business and having such work done are manifestly acts which are ultra vires." See, to the same effect, *Cooper* v. *City of Athens,* 53 *Ga.* 638; *Mayor &c. of Leesburg* v. *Putnam,* 103 *Ga.* 110 (29 S. E. 602, 68 Am. St. R. 80) ; *City of Barnesville* v. *Murphey,* 113 *Ga.* 780 (39 S. E. 413).

Where the mayor and council of a municipality are threatening to do acts which are ultra vires, not authorized under the charter, it has been held proper to enjoin the authorities from carrying into effect such threatened acts. *Mayor &c. of Americus* v. *Perry,* 114 *Ga.* 871, 884 (40 S. E. 1004, 57 L. R. A. 230) ; *Clark* v. *Cline,* 123 *Ga.* 856, 864 (51 S. E. 617) ; *Mayor &c. of Macon* v. *Hughes,* 110 *Ga.* 795 (2) (36 S. E. 247) ; *Cheney* v. *Ragan,* 151 *Ga.* 735, 741 (108 S. E. 30). What is known as the general welfare of a municipal corporation falls within what is also known as the police power or powers to make police regulations, and includes authority "to make reasonable provision for the peace, safety, and convenience of its inhabitants." *Macon Consolidated Street R. Co.* v. *Macon,* 112 *Ga.* 782 (38 S. E. 60). Under these powers a municipal corporation can not prohibit one from carrying on a lawful vocation when there is nothing in the character of the business carried on which is calculated to interfere with "the peace, good order, and safety of the community." *Watson* v. *Thomson,* 116 *Ga.* 546 (42 S. E. 747, 59 L. R. A. 602, 94 Am. St. R. 137). On the same principle these general terms do not afford authority for the municipality itself to enter into a business occupation such as is usually carried on by private individuals or private corporations, and which has

nothing to do with the peace, good order, and safety of the community, as that term is usually understood, without express legislative authority.  The plaintiffs rely chiefly, to establish their contention, on the case of *Frederick* v. *Augusta,* 5 *Ga.* 561.  We do not think the case is controlling authority.  The contention of the defendants in the present case is more far-reaching than the decision in the *Frederick* case authorizes, and the doctrine of that case should not be extended.  The General Assembly, by way of preamble, specified certain reasons for conferring power upon the City of Augusta for specified objects, which were stated in the *Frederick* case to be "for the safety, benefit, convenience, and advantage of said city, as shall appear to them expedient."  In point of fact this means no more than the language usually employed in the grant of municipal charters; that is, municipal governments are usually granted power to do such things as are "for the safety, benefit, and convenience of the city."  When the legislature put in the additional language, "as shall appear to them expedient," this conferred no additional power.  Necessarily the mayor and council of a municipal government must in all cases construe the general grant of power as it "shall appear to them expedient."  Moreover, as this court construed the *Frederick* case, it had to do with making tax assessments on the inhabitants of the city "for the purpose of better securing an abundant supply of water for the city as well as for manufacturing purposes."  The securing of an abundant supply of water has uniformly been held to fall within the things necessarily incident to and within the purview of municipal government.  The fact that it proposed, in addition to securing an abundant supply of water for the city, to secure water "as well as for manufacturing purposes" does not alter the question.  We take it that wherever a municipal corporation secures an abundant supply of water for the city, this includes, as an incident thereof, the supply of water to the individual inhabitants of the city for such business purposes as may be desired.

For the reasons stated above we think the judgment of the court granting the interlocutory injunction should be affirmed.